UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| HOUSE OF BRYANT PUBLICATIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 3:14-CV-93-TAV-HBG |
| | ) | |
| CITY OF LAKE CITY, TENNESSEE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This civil action is before the Court on Plaintiff's Motion for Injunction Pending

Appeal Based on New Facts [Doc. 53]. Defendant City of Lake City, Tennessee (the

"City") filed a response [Doc. 56],[1] and plaintiff House of Bryant Publications, LLC

("House of Bryant") replied [Doc. 57]. Defendants Rocky Top Tennessee Marketing and

Manufacturing Co., Tim Isbel, Brad Coriell, Mark Smith, and Michael Lovely (the

"developer defendants") also filed a response [Doc. 59], and plaintiff replied to that

response as well [Doc. 62].

The Court held a hearing on the motion, and after the hearing, the developer

defendants sought leave to file a supplemental brief [Doc. 64]. The developer defendants

assert that the proposed supplemental response addresses arguments made by plaintiff at

the hearing as well as a case relied upon by plaintiff. Plaintiff responded in opposition,

---

[1] In the City's response, the City informs the Court that it is now known as "Rocky Top,
Tennessee" [Doc. 56]. Because the pleadings have not been amended to reflect this name
change, the Court continues referring to this defendant as "City of Lake City, Tennessee."

asserting that the developer defendants had ample time to research and brief the issues before the Court [Doc. 66]. Plaintiff also requests that the Court award plaintiff the costs associated in responding to the motion to file a supplemental brief.

Upon review of the developer defendants' proposed supplemental brief [Doc. 64-1], the Court finds it addresses matters that plaintiff could have addressed either in its response brief, which the Court ordered due over two weeks before the motion for leave was filed, or at the hearing. Nonetheless, the Court will grant the developer defendants' request for leave and consider the developer defendants' supplemental brief [Doc. 64-1]. It will also consider plaintiff's response to that brief [Doc. 66].[2]

## I.      Procedural Posture

On May 28, 2014, the Court denied plaintiff's motion for a preliminary injunction [Doc. 45], which requested that the Court enjoin the City from changing its name to "Rocky Top," enjoin all defendants from pursuing or supporting efforts pertaining to the City's name change, and prohibit development of plans for an amusement park or other development trading on the name "Rocky Top" until such time the Court may determine the rights of the parties in this action. In doing so, the Court addressed the motion separately with respect to the City and the developer defendants. In denying the motion against the City, the Court determined that the City would not likely be using plaintiff's "ROCKY TOP" marks in commerce. In denying the motion against the developer

---

[2] While the Court may award expenses when a party fails to comply with a pretrial order of the Court, *see* Fed. R. Civ. P. 16(f), the Court declines to do so here because it is granting the developer defendants' motion and considering both parties' supplemental briefs.

2

defendants, the Court determined that plaintiff likely did not have standing to assert its trademark claims against the developer defendants and that plaintiff's trademark claims against the developer defendants were not likely ripe. In making that decision, the Court relied upon the developer defendants' assertions that they did not have any plans to use, sell, or otherwise infringe upon plaintiff's marks.

Plaintiff subsequently filed a notice of appeal of the decision denying the motion for a preliminary injunction [Doc. 46], and on the next day, plaintiff filed another motion for injunctive relief with this Court, which sought to enjoin the City from changing its name to "Rocky Top" pending the decision of the United States Court of Appeals for the Sixth Circuit [Doc. 47]. The Court promptly heard that motion, as plaintiff filed the motion approximately twenty-four hours before the City was scheduled to vote on the name change, and denied it [Docs. 50, 52].[3] Approximately two months later, plaintiff filed the motion currently pending before the Court [Doc. 53]. On October 6, 2014, the Court held a hearing on the motion [Doc. 63].[4]

Plaintiff does not urge the Court to exercise jurisdiction here despite the appeal of the denial of the motion for a preliminary injunction.[5] Instead, plaintiff requests relief

---

[3] Plaintiff did not appeal this decision.

[4] On October 2, 2014, the United States Court of Appeals for the Sixth Circuit issued an order vacating the appellate briefing schedule and holding the appeal in abeyance for thirty days. *House of Bryant Publ'ns, LLC v. City of Lake City, Tenn.*, No. 14-5767 (6th Cir. filed Oct. 2, 2014).

[5] "The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S.

3

pursuant to Rule 62.1 of the Federal Rules of Civil Procedure and Rule 12.1 of the

Federal Rules of Appellate Procedure.[6]   The Court adheres to plaintiff's request and

---

56, 58 (1982); *accord United States v. Garcia–Robles*, 562 F.3d 763, 767–68 (6th Cir. 2009). This transfer of power, however, does not effect a total divestiture of jurisdiction from the district court: the district court retains jurisdiction to enforce its judgment, *City of Cookeville v. Upper Cumberland Elec. Membership Corp.*, 484 F.3d 380, 394 (6th Cir. 2007), to proceed with matters that will aid the appellate process, *Cochran v. Birkel*, 651 F.2d 1219, 1221 (6th Cir. 1981), and to adjudicate matters unrelated to the issues on appeal, *Weaver v. Univ. of Cincinnati*, 970 F.2d 1523, 1528–29 (6th Cir. 1992).   With respect to the grant or denial of a motion for a preliminary injunction in particular, an appeal "does not divest the district court of jurisdiction to proceed with the action on the merits."   *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1174 (6th Cir. 1995) (citation omitted).

   [6]  Rule 62.1 provides:

>    **(a) Relief Pending Appeal.** If a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may:
>
>    **(1)** defer considering the motion;
>
>    **(2)** deny the motion; or
>
>    **(3)** state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue.
>
>    **(b) Notice to the Court of Appeals.** The movant must promptly notify the circuit clerk under Federal Rule of Appellate Procedure 12.1 if the district court states that it would grant the motion or that the motion raises a substantial issue.
>
>    **(c) Remand.** The district court may decide the motion if the court of appeals remands for that purpose.

Fed. R. Civ. P. 62.1.  Correspondingly, Rule 12.1 provides:

>    **(a) Notice to the Court of Appeals.** If a timely motion is made in the district court for relief that it lacks authority to grant because of an appeal that has been docketed and is pending, the movant must promptly notify the circuit clerk if the district court states either that it would grant the motion or that the motion raises a substantial issue.

4

examines the pending motion under the parameters set forth in Rule 62.1. Hence, the Court may "(1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." Fed. R. Civ. P. 62.1(a). For the reasons that follow, the Court is stating that it would grant the motion, to the extent stated, if the Court of Appeals for the Sixth Circuit remands for that purpose.

## II.    Preliminary Injunction Analysis

Rule 65 of the Federal Rules of Civil Procedure permits a party to seek injunctive relief if the party believes it will suffer irreparable harm or injury during the pendency of the action. Fed. R. Civ. P. 65. A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).

In determining whether to grant a plaintiff's request for injunctive relief, the Court must consider four factors: (1) whether the movant would suffer irreparable harm without the injunction; (2) whether issuance of the injunction would cause substantial harm to others; (3) whether the public interest would be served by the issuance of the injunction; and (4) whether the movant has demonstrated a strong likelihood of success on the merits. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir.

---

**(b) Remand After an Indicative Ruling.** If the district court states that it would grant the motion or that the motion raises a substantial issue, the court of appeals may remand for further proceedings but retains jurisdiction unless it expressly dismisses the appeal. If the court of appeals remands but retains jurisdiction, the parties must promptly notify the circuit clerk when the district court has decided the motion on remand.

Fed. R. App. P. 12.1.

2002) (citation omitted); *accord Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005) (citation omitted). The factors are to be balanced and are "not prerequisites that must be met." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (citation and internal quotation marks omitted). A stronger showing of likelihood of success on the merits is required if the other factors militate against granting relief, but a lesser showing of likelihood of success on the merits is required when the other factors support granting relief. *Performance Unlimited, Inc. v. Questar Publ'rs, Inc.*, 52 F.3d 1373, 1385–86 (6th Cir. 1995) (citations omitted).

### A. Strong Likelihood of Success on the Merits

Unlike with plaintiff's prior motion, it appears that plaintiff is arguing likelihood of success on the merits of only its claim of trademark infringement under the Lanham Act. In examining the likelihood of success on the merits, the Court considers the developer defendants' arguments that there still is no case or controversy, that plaintiff is not likely to succeed on the merits of its trademark infringement claim, and that the fair use defense applies here.

### 1. Justiciability

Previously, the Court determined that it was not likely that plaintiff has standing as to the developer defendants and that the claims against the developer defendants were not likely ripe [Doc. 45]. In making this preliminary determination, the Court recognized that the two issues—standing and ripeness—overlapped because of the nature of the alleged injury:

6

Notably, "[t]here is unquestionably some overlap between ripeness and standing[,]" and "[w]hen the injury alleged is not actual but merely threatened, standing and ripeness become more difficult to distinguish." *Airline Prof'ls Ass'n of Int'l Bhd. of Teamsters, Local Union No. 1224, AFL-CIO v. Airborne, Inc.*, 332 F.3d 983, 988 (6th Cir. 2003). Therefore:

> Although standing and ripeness are considered separate issues, in practice they involve overlapping inquiries. If no injury has occurred, the plaintiff could be denied standing or the case could be dismissed as not ripe. The question whether an alleged injury is sufficient to meet the constitutional "case or controversy" requirement is at the heart of both doctrines.

*Kardules v. City of Columbus*, 95 F.3d 1335, 1343 (6th Cir. 1996).

[Doc. 45]. While the Court examined standing and ripeness separately, the Court's analysis focused on the fact that it was not likely there was a case or controversy with respect to the developer defendants because—to put it simply—any injury as a result of the developer defendants' conduct was hypothetical at that time. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007) (acknowledging that standing and ripeness can be intertwined: "standing and ripeness boil down to the same question in this case"). Given of the nature of the Court's analysis, the Court finds it appropriate to now consider, again in the preliminary injunction context,[7] whether plaintiff is likely to

---

[7] The Court recognizes its authority and obligation to sua sponte raise standing. *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 983 (6th Cir. 2012); *see also United States v. Hays*, 515 U.S. 737, 742, (1995) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" (quoting *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 230–231 (1990))). Though given the current procedural posture, today the Court merely decides whether it is likely that there is a case or controversy with respect to the developer defendants. *See U.S. Student Assoc. Found. v. Land*, 546 F.3d 373, 381 (6th Cir. 2008) (in the context of an emergency motion to stay an

7

succeed on the merits of its trademark infringement claim against the developer defendants in the face of the developer defendants' arguments that there is no case or controversy. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (stating that "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits" (citations omitted)); *see also Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 139–40 (1974) (stating that "ripeness is peculiarly a question of timing," and where a "change in circumstance has substantially altered the posture of the case as regards the maturity of [plaintiff's claims,] . . . it is the situation now . . . that must govern" (footnote omitted)).

In examining this issue, the Court does not overlook that many of the facts forming the basis for plaintiff's argument that there is now a case or controversy are not part of the complaint. *See Cleveland Branch, N.A.A.C.P. v. City of Parma, Ohio*, 263 F.3d 513, 524 (6th Cir. 2001) (recognizing that standing "is to be determined as of the time the complaint is filed"). Given the procedural posture, the Court assumes for purposes of this analysis that plaintiff would seek leave to file a supplemental complaint with the new facts asserted in the present motion. *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473–74 (2007) ("[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction."). Indeed, Rule 15(d) of the Federal Rules of Civil Procedure

---

injunction, discussing the likelihood that the defendants could show that the plaintiffs lacked standing); *Sesi v. Fed. Home Loan Mortg. Corp.*, No. 12-cv-10608, 2012 WL 628858, at *11 (E.D. Mich. Feb. 27, 2012) (finding that the plaintiff "likely lacks standing" and denying a motion for injunctive relief, without dismissing for lack of standing).

allows a party to serve a supplemental pleading to cure defects in the initial complaint, including deficiencies in subject matter jurisdiction.[8] *See Mathews v. Diaz*, 426 U.S. 67, 75 (1976) (explaining that there was "little difficulty" in a party's failure to file an application that was a "nonwaivable condition of jurisdiction" until after he was joined in the action because "[a] supplemental complaint in the District Court would have eliminated this jurisdictional issue"); *League of Latin Amer. Citizens v. Bredesen*, 500 F.3d 523, 529–30 (6th Cir. 2007) (noting that "it would not serve justice to dismiss the appeal" where the defendant did not raise a standing issue "below, at a time when plaintiffs could have moved for and been freely granted leave to amend their complaint to cure the standing defect").

Turning then to whether the alleged facts in the record would present a case or controversy, the Declaratory Judgment Act (the "Act") provides:

> In a case of *actual controversy* within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

---

[8] The rule provides:

> On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time.

Fed. R. Civ. P. 15(d).

9

28 U.S.C. § 2201 (emphasis added).  According to the Supreme Court, demonstrating an "actual controversy" for the purpose of a declaratory judgment action requires nothing more than the showing required under Article III.  *MedImmune*, 549 U.S. at 126–27.  For there to be a case or controversy under Article III, the dispute must be "'definite and concrete, touching the legal relations of the parties having adverse legal interests'; and [must] be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'"  *Id.* at 127 (alteration in original) (citation omitted).  And while there is no bright-line rule for distinguishing cases that satisfy the actual controversy requirement from those cases that do not, the ultimate "question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Id.*  In applying the all-the-circumstances test, courts are guided by the doctrines of standing, ripeness, and mootness.[9]  *See Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1338 (Fed. Cir. 2008) (recognizing that "the 'immediacy and reality' inquiry can be viewed through the lens of standing'"); *Caraco Pharm. Labs, Ltd. v. Forest Labs, Inc.*, 527 F.3d 1278, 1291 (Fed. Cir. 2008) (recognizing that these concepts bear on whether a case is justiciable under Article III).

---

[9]  Mootness is not an issue here.

10

At bottom, the developer defendants argue that they have not used "Rocky Top," so there is no case or controversy. This assertion relates to the doctrines of standing and ripeness, or in other words, whether the dispute is immediate and real. The parties have cited the Court to several cases addressing this issue, and the Court has examined them in determining the likelihood that plaintiff's trademark infringement claim against the developer defendants presents an actual controversy.

In *Geisha v. Tuccillo*, the plaintiff, who opened a restaurant called "Japonais" in Chicago, sought a declaration of infringement against the defendant, a prospective restaurant owner, who attempted to federally register the name "Japonais" based upon his intent to use the mark. 525 F. Supp. 2d 1002, 1006 (N.D. Ill. 2007). Applying the totality-of-the-circumstances test from *MedImmune*, the court held that there was no actual controversy. *Id.* at 1015. In reaching this decision, the court noted that the defendant had filed an intent-to-use application for a stylized version of the word "Japonais" for a restaurant. Yet, the defendant, who had never opened a restaurant before, had only "play[ed] around with a menu," had no specific location in mind, and was not using a real estate agent to look for a location but merely "driving around and looking for properties by himself." *Id.* at 1015–16. And although the defendant owned property suitable for a restaurant, he rented it out and seemingly "abandoned that plan." *Id.* at 1016. Based upon these facts, the court determined that the defendant's "actual preparations for opening a restaurant [did] not appear to have advanced significantly beyond [his] statement of intent." *Id.*

11

Yet in two other cases where intellectual property owners sought declarations of impending infringement, the courts have determined there was an actual controversy, and the Court finds that those cases are more akin to the situation presently before Court than *Geisha*.

In *Young v. Vannerson*, the plaintiffs, Vincent Paul Young, Jr. and Vince Young, Inc., sued the defendants, alleging trademark infringement. 612 F. Supp. 2d 829, 833 (S.D. Tex. 2009). Plaintiff Young, a professional football player, asserted that he is widely known by his initials (VY) and the nickname "Invinceable." *Id.* One of the defendants filed intent-to-use trademark applications to use the marks "VY" and "INVINCEABLE" for various commercial products. *Id.* The plaintiffs claimed to have common-law ownership of the marks and sought a declaratory judgment against the defendants. *Id.* The defendants moved to dismiss, arguing that that the case did not present an actual controversy. *Id.* at 837. The court determined that there was an actual controversy because "the defendants [had] expended considerable sums to develop and to market the VY and INVINCEABLE marks," "allegedly designed and produced decals and T-shirts using a VY logo that is allegedly substantially similar to Vincent Young, Inc's VY shield," "'contracted with a manufacturing company to produce VY decals and T-Shirts bearing their VY logo,'" "produced samples of various other products incorporating the VY logo and the INVINCEABLE mark," and "allegedly contacted manufacturers and tested the market with these samples." *Id.* at 845.

In *AARP v. 200 Kelsey Associates, LLC*, the plaintiff had launched *Modern Maturity*, its "flagship publication," which was intended for readers aged fifty years and above. No. 06 Civ. 81(SCR), 2009 WL 47499, at *1 (S.D.N.Y. Jan. 8, 2009). About four years later, in 1962, the plaintiff obtained a federal trademark registration for the *Modern Maturity* mark. *Id.* But in 2003, the plaintiff changed the name of its publication to *AARP, The Magazine*, although it continued to use the *Modern Maturity* mark in connection with other products and services. *Id.* The defendants, seeking to launch a magazine intended for senior citizens called "Modern Maturity," filed an intent-to-use trademark application for "Modern Maturity." *Id.* In preparation for this launch, the defendants also "contacted potential publishers, generated written business plans concerning the design and sale of the magazine, and engaged in extensive market analysis." *Id.* The plaintiff sought a declaratory judgment of trademark infringement, but the defendants asserted there was no actual case or controversy because they had not yet sold their magazine. *Id.* at *3. In examining this argument, the court held that there was an actual controversy. It found that the defendants had "taken significant steps" toward infringement, including "actively seeking licenses to publish a magazine called 'Modern Maturity,' and 'conduct[ing an] extensive analysis of the publishing industry.'" *Id.* at *9 (alteration in original). The court also recognized the plaintiff's allegations that the defendants were actively searching for a licensing partner and noted that the plaintiff did not have to "wait for defendants to actually secure that partner before filing suit." *Id.* It further noted that securing a licensing partner for actual publication "presumably occurs

13

only after one has made a number of concrete decisions concerning the proposed content, design, and layout of the magazine" and that "once a licensing partner is identified, little will remain for defendants to do other than commence production, distribution, and sale of the magazine." *Id.*

Like in *Young* and *AARP*, the developer defendants have taken significant steps toward infringement of plaintiff's "ROCKY TOP" marks. While the developer defendants may not yet be selling products incorporating "Rocky Top," the developer defendants have participated in the name change of the City, have formulated a business plan regarding use of "Rocky Top," have filed intent-to-use applications that include some iteration of "Rocky Top," have secured a licensing partner, and have produced sample shirts. There is seemingly little remaining for the developer defendants to do "other than commence production, distribution, and sale" of their "Rocky Top" goods. *Id.*; *see also Young*, 612 F. Supp. 2d at 843–44 (explaining that pre-*MedImmune* case law demonstrates that the case or controversy requirement is met where "a party has taken steps such as producing prototypes or samples of the allegedly infringing products, soliciting business from and sending advertising to potential customers, or otherwise investing significant funds in preparation to produce the products," but not where "a party has not yet identified a name or location of a business, has not conducted any sales activity, or has not secured the necessary components for production").

Thus, considering all the circumstances, the Court finds that it is likely plaintiff now has a justiciable trademark infringement claim against the developer defendants.

14

### 2.     Trademark Infringement Claim

To prevail on a trademark infringement claim, a plaintiff must demonstrate: "(1) that it owns a valid, protectable trademark; (2) that the defendant used the mark in commerce and without the registrant's consent; and (3) there was a likelihood of consumer confusion." *Abercrombie & Fitch v. Fashion Shops of Ky., Inc.*, 363 F. Supp. 2d 952, 959 (S.D. Ohio 2005) (citations omitted).

### a.     Valid, Protectable Trademark

Plaintiff owns at least nine trademark registrations related to "ROCKY TOP" on the Principal Register [*See* Doc. 54 p. 4 n.2; *see also* Doc. 1-4]. "Registration of a mark on the Principal Register of the [United States Patent and Trademark Office] creates a rebuttable presumption that a trademark is valid, that is, either inherently distinctive or descriptive with secondary meaning, and therefore, protectable under federal trademark law." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 513 (6th Cir. 2007) (citing 15 U.S.C. § 1115(a)). "The effect of the statutory presumption . . . is to shift the burden of proof to the alleged infringer, in this case [the developer defendants], to prove the absence of secondary meaning." *Id.* at 514 (citation omitted).

The developer defendants argue that plaintiff's marks are not valid. As a basis for this argument, the developer defendants contend that plaintiff has not used plaintiff's marks. Yet, the developer defendants have made this statement without any support, and the record demonstrates the contrary is likely true; that is, that plaintiff likely has been using its marks. Indeed, in the record is plaintiff's licensing agreement with the

15

University of Tennessee, through which plaintiff has granted the University of Tennessee "a worldwide exclusive license . . . in and to all of House of Bryant's right, title, and interest in and to the [trademark ROCKY TOP] . . . ." [Doc. 43-1],[10] along with a list of manufacturers, distributors, and retailers in nineteen states who may use plaintiff's marks [Doc. 66-3]. Moreover, defendants themselves acknowledged during the hearing on the initial motion for a preliminary junction that they "believe[d]" that "things like license plate holders, decorative magnets, bumper stickers and other various trinkets . . . are sold in very limited circumstances at the UT Book Store and possibility the hotel that [plaintiff's counsel was] staying at" [Doc. 44 p. 22; *see also* Doc. 59-1 ("I am aware that various t-shirts and other items are being sold in stores in Anderson County, Tennessee bearing the notations Rocky Top. Some of these items reflect that they are officially licensed by the University of Tennessee but some do not.")]. Thus, at this stage of the proceedings, the Court finds that plaintiff has likely been using its marks and that its marks are likely valid, protectable trademarks.

### b.     Used the Mark in Commerce Without Consent

The developer defendants argue that they are not using "Rocky Top" in commerce, so plaintiff is not likely to succeed on its trademark infringement claim against them. Yet, "[c]ourts have found that a trademark infringement claim satisfies this element and may proceed even if a product has not actually been sold." *Young*, 612 F. Supp. 2d at 847 (citations omitted); *accord Bertolli USA, Inc. v. Filippo Bertolli Fine*

---

[10]  This agreement became effective on September 1, 2013, and has a term of five years [Doc. 43-1].

*Foods, Ltd.*, 662 F. Supp. 203, 205 (S.D.N.Y. 1987) (finding the "use in commerce" element satisfied where the defendants sent one bottle of olive oil to a distributor, offered the product to another, and printed labels and cartons for the allegedly infringing oil). While the developer defendants may not yet be selling products in commerce that incorporate "Rocky Top," the developer defendants have participated in the name change of the City, have formulated a business plan, have filed intent-to-use applications, have secured a licensing partner, and have produced sample shirts. Thus, "it is reasonable to infer that, in doing so, [the developer defendants] have not only used the [ROCKY TOP] mark[s], but have [likely] done so through the channels of commerce." *AARP*, 2009 WL 47499, at *11 (finding the "use in commerce" element satisfied where defendants were "actively seeking licenses to publish" an allegedly infringing magazine and had "conducted an extensive analysis of the publishing industry").

### c. Likelihood of Confusion

In determining whether a "likelihood of confusion" exists, the Court must consider eight factors:

> (1) strength of the plaintiff's mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) intent of the defendant in selecting the mark; and (8) likelihood of expansion of the product lines.

*Abercrombie*, 363 F. Supp. 2d at 959 (citing *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982)). These factors "'imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors

listed are present in any particular case to be successful.'" *Id.* (quoting *PACCAR Inc. v. TeleScan Techs., L.L.C.*, 319 F.3d 243, 249–50 (6th Cir. 2003)). The "ultimate question [is] whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1116 (6th Cir. 1996) (quoting *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991)). Plaintiff argues that the "precise goal" of the developer defendants is "for consumers to be confused by and to associate its 'marks' with House of Bryant's ROCKY TOP Marks" [Doc. 54].

### i.      Strength of the Mark

The Sixth Circuit has stated:

> The strength of a mark is a factual determination of the mark's distinctiveness. The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore, the more protection it is due. A mark is strong and distinctive when the public readily accepts it as the hallmark of a particular source; such acceptance can occur when the mark is unique, when it has received intensive advertisement, or both.

*AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 793 (6th Cir. 2004) (quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997)). The stronger the mark, "the greater the likelihood of confusion." *Id.* (citation omitted).

Plaintiff argues that its "ROCKY TOP" marks are famous, as the phrase is "an immediately recognizable and highly distinctive trademark most strongly associated with Plaintiff's primary licensee, the University of Tennessee" [Doc. 54]. Plaintiff further

asserts that it has sought registration for eleven different categories of goods and services with respect to the "ROCKY TOP" marks, and those are sold and distributed in interstate and foreign commerce. The Court finds these points persuasive at this juncture to suggest that plaintiff's marks are strong. And while the developer defendants remind the Court that it previously addressed the fame of plaintiff's marks in a manner unfavorable to plaintiff, the Court notes that analysis concerned fame with respect to trademark dilution. *See Libbey Glass, Inc. v. Oneida Ltd.*, 61 F. Supp. 2d 700, 717 (N.D. Ohio 1999) ("[T]he standard for fame and distinctiveness required to obtain anti-dilution protection is more rigorous than that required to seek infringement protection." (citation omitted)).

### ii.    Relatedness of the Goods

In terms of the relatedness of the goods at issue, "[c]ourts have recognized that there are basically three categories of cases: (1) direct competition of services, in which case confusion is likely if the marks are sufficiently similar; (2) services are somewhat related but not competitive, so that likelihood of confusion may or may not result depending on other factors; and (3) services are totally unrelated, in which case confusion is unlikely." *Homeowners Grp., Inc.*, 931 F.2d at 1108. "'The question is, are the services related so that they are likely to be connected in the mind of a prospective purchaser?'" *Id.* at 1109 (citation omitted).

Plaintiff argues that the developer defendants have applied to register at least eight trademarks incorporating "Rocky Top" and thereby have expressed a specific interest in

19

producing and distributing goods in direct competition with plaintiff's goods. Indeed, they assert, the goods identified by the developer defendant's trademark applications cover "nearly every good" for which plaintiff has registered its "ROCKY TOP" marks. The Court finds these arguments persuasive in demonstrating likelihood of relatedness.

### iii.    Similarity of the Marks

In evaluating similarity, "it is axiomatic in trademark law that 'side-by-side' comparison is not the test. Instead, a court must determine, in the light of what occurs in the marketplace, whether the mark will be confusing to the public when singly presented." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1187 (6th Cir. 1988) (internal citations, alterations, and quotation marks omitted). "A proper analysis of similarity includes examining the pronunciation, appearance, and verbal translation of conflicting marks." *Id.* at 1188.

Plaintiff argues that the developer defendants are attempting to copy exactly the pronunciation, appearance, and verbal translation of plaintiff's marks. Plaintiff further argues that the only changes to plaintiff's marks are superficial, such as adding non-distinguishing terms. Upon review of plaintiff's marks and the marks set forth in the developer defendants' intent-to-use applications, the Court finds plaintiff's arguments persuasive in demonstrating a likelihood of similarity. Indeed, even if two marks "are not word-for-word copies of one another," the mere addition of other terms to a registered mark does not eliminate the similarity between the marks, nor does it overcome a

likelihood of confusion, if "the two marks, when considered in their entireties, are strikingly similar." *In re Chatam Int'l Inc.*, 380 F.3d 1340, 1343 (Fed. Cir. 2004).

### iv.    Evidence of Actual Confusion

While "[e]vidence of actual confusion is undoubtedly the best evidence of likelihood of confusion," *Wynn Oil*, 839 F.2d at 1188, plaintiff concedes that it cannot currently offer evidence of actual confusion. Even so, the lack of such evidence is rarely significant. *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 284.

### v.    Marketing Channels Used

In weighing this factor, the Court must "consider the similarities or differences between the predominant customers of the parties' respective goods or services" and "determine whether the marketing approaches employed by each party resemble each other." *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 284. Plaintiff argues that the developer defendants are registering similar marks for the same goods and services to be used and sold in the same region as plaintiff's goods. At this point in the proceeding, the Court finds these arguments persuasive in demonstrating a likelihood that similar marketing channels will be used by the parties.

### vi.    Likely Degree of Purchaser Care

The Sixth Circuit has stated:

> Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution. However, when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard is proper. Similarly, when services are expensive or unusual, the buyer can be expected to exercise greater care in her

21

> purchases. When services are sold to such buyers, other things being
> equal, there is less likelihood of confusion.

*Homeowners Grp., Inc.*, 931 F.2d at 1111. Plaintiff claims that the developer defendant's use of plaintiff's marks, along with the color orange and lyrics from the song, seeks to create a false association with the University of Tennessee. Given this and the famous loyalty of the university's fans, plaintiff argues that the degree of purchaser care will be low. The Court finds that this factor currently weighs in plaintiff's favor, as consumers do not typically exercise a great deal of care when buying relatively inexpensive items, such as t-shirts. *Audi AG v. D'Amato*, 469 F.3d 634, 544 (6th Cir. 2006).

### vii.    Defendants' Intent in Selecting the Mark

"Proving intent is not necessary to demonstrate likelihood of confusion, but the presence of that factor strengthens the likelihood of confusion." *AutoZone, Inc.*, 373 F.3d at 799 (citation and internal quotation marks omitted). "If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." *Id.* Intent is relevant because purposeful copying indicates that the defendant, who has at least as much knowledge as the trier of fact regarding the likelihood of confusion, believes that his copying may divert some business from the senior user. *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 286. Circumstantial evidence of copying, particularly the use of a contested mark with knowledge of the protected mark at issue, is sufficient to support an inference of intentional infringement where direct evidence is not available. *AutoZone, Inc.*, 373 F.3d at 799.

22

Plaintiff submits that the developer defendants have "explicitly proclaimed that they chose the name ROCKY TOP to capture the 'magic' associated with ROCKY TOP and thereby 'bring [tourists] in'" [Doc. 54].[11] They have further indicated that "[s]uccess comes in a name — the name of Rocky Top" [*Id.*]. And, plaintiff argues, circumstantial evidence exists that demonstrates that the developer defendants were aware of plaintiff's objection to their use of "Rocky Top," as evidenced by the cease-and-desist letter and the filing of litigation [Doc. 1-8; *see also* Docs. 3-10, 3-11]. The Court finds all of these points persuasive to suggest that the developer defendants' intent in selecting the marks set forth in the intent-to-use applications was to copy plaintiff's marks.[12]

### vii. Likelihood of Expansion of the Product Lines

"[A] strong possibility that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 287. A geographic expansion or an increase in the types of products or services offered can be relevant. *Id.* Plaintiff argues that given the developer defendants' registration in several

---

[11] While the developer defendants argue that the Court cannot consider statements in newspaper articles, "the Federal Rules of Evidence generally do not apply to preliminary injunction hearings." *Damon's Rests., Inc. v. Eileen K Inc.*, 461 F. Supp. 2d 607, 620 (S.D. Ohio 2006) (noting that district courts within the Sixth Circuit "have considered [hearsay] evidence, as have numerous other circuit courts," in addressing motions for a preliminary injunction (citing cases)); *accord Fidelity Brokerage Servs. LLC v. Clemens*, No. 2:13-CV-239, 2013 WL 5936671, at *5 (E.D. Tenn. Nov. 4, 2013) ("Generally speaking, district courts within this circuit have not required stringent adherence to rules of evidence when reviewing petitions for injunctive relief and have considered such evidence.").

[12] *See also* the Court's discussion regarding the fair use defense, *infra* Section II.A.3.

categories of goods or services that compete with plaintiff's goods or services, there is a strong possibility that the parties will compete with each other. The Court agrees.

In sum, the analysis of the eight factors suggests that it is likely that the developer defendant's use of "Rocky Top" creates a likelihood of confusion. In other words, the Court finds, for purposes of this stage of the proceedings, that it is likely that consumers are "likely to believe that the products . . . offered by the parties are affiliated in some way." *Homeowners Grp., Inc.*, 931 F.2d at 1107.

### 3. Fair Use Defense

The developer defendants assert that they are entitled to use the phrase "Rocky Top" as a geographic descriptor, an argument that employs what is known as the fair use defense.[13] The Lanham Act provides a defendant with an affirmative defense where the use of a trademark is:

> a use, otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, *or their geographic origin*.

15 U.S.C. § 1115(b)(4) (emphasis added). "Under the fair use doctrine, the holder of a trademark *cannot* prevent others from using the word that forms the trademark in its *primary* or *descriptive* sense." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 612 (6th Cir. 2009) (citation and internal quotation marks omitted). "Fair use permits others to use

---

[13] The developer defendants raise fair use as an affirmative defense in their answer [Doc. 20 ¶ 194].

a protected mark to describe aspects of their own goods, provided the use is in good faith and not as a mark." *Id.* (quoting *Car–Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 270 (2d Cir. 1995)) (alteration omitted). In other words, a defendant must have used the mark (1) in its descriptive sense, and (2) in good faith. *Id.* (citation omitted); *accord Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1151 (9th Cir. 2002) (recognizing three elements of a fair use defense: (1) "use of the term is not as a trademark or service mark"; (2) use of the term is "fairly and in good faith"; and (3) the term is used only to describe the defendant's goods (internal quotation marks omitted)). Regarding a description of geographic origin, the "description . . . must . . . be made in a purely descriptive and non-trademark sense." *Schafer Co. v. Innco Mgmt. Corp.*, 797 F. Supp. 477, 481 (E.D.N.C. 1992) (citation omitted), *aff'd*, 995 F.2d 1064 (4th Cir. 1993). And because the fair use defense is an affirmative defense, the burden is on the defendant to demonstrate the applicability of the defense. *Kelly-Brown v. Winfrey*, 717 F.3d 295, 312 (2d Cir. 2013) (noting defendants "bear the burden in establishing a fair use defense").

Based upon the record before it, the Court finds that the developer defendants are not likely to succeed in asserting the fair use defense. First, it appears that the developer defendants are using "Rocky Top" as a mark. The developer defendants have filed several intent-to-use applications that incorporate some iteration of "Rocky Top," and in so doing, they have declared their intent to use the phrase as a trademark [*See, e.g.*, Doc. 54-3 p. 7–8 (setting forth declaration signed by defendant Timothy Isbel as President of defendant Rocky Top Tennessee Marketing and Manufacturing)]. They have also

entered into an exclusive licensing agreement with Marc Nelson Denim, a Knoxville-based denim brand, which suggests that the developer defendants themselves believe they are using the phrase "Rocky Top" as a mark [Doc. 54-12 ("Rocky Top Tennessee Marketing and Manufacturing, along with Marc Nelson Denim today announced a new partnership in which the Knoxville-based denim brand would become the exclusive licensee of Rocky Top, Tennessee apparel and souvenirs.")]. *See Critter Control, Inc. v. Young*, No. 3:13-0695, 2014 WL 4411666, at \*12 (M.D. Tenn. Sept. 8, 2012) (report and recommendation) (where plaintiff, who owned the mark "Critter Control," sued a defendant for his use of "Elite Critter Control," the court determined that the fair use defense was unavailable because the "[d]efendant's use of the mark was not a mere usage of the words to describe his own services but was a competing use of the words at issue as a mark to identify the [d]efendant's own business"); *The Ohio State Univ. v. Thomas*, 738 F. Supp. 2d 743, 754–55 (S.D. Ohio 2010) (finding fair use defense unavailable where the defendants used the plaintiff's marks in the defendants' website domain name and throughout the pages of its website about the defendants' athletic program because "the terms and logos [defendants] have chosen to use are not being used 'otherwise as a mark'"); *Victoria's Secret Stores v. Artco Equip. Co.*, 194 F. Supp. 2d 704, 724 (S.D. Ohio 2002) (finding that the defendant used the VICTORIA'S SECRET trademark in a trademark sense—that is, used "it to identify the source of his goods to the public and to distinguish those goods from others"—and not a descriptive sense where the defendant

"incorporated the VICTORIA'S SECRET trademark in the domain name, hyperlinks, metatags, and text of their website in a trademark sense").

Second, it does not appear likely that the developer defendants are using plaintiff's "ROCKY TOP" marks in good faith. The developer defendants were seemingly instrumental in the City of Lake City, Tennessee, changing its name to Rocky Top, Tennessee. Prior to the City changing its name from Lake City to Rocky Top, the developer defendants were aware of plaintiff's trademarks [Docs. 3-10, 3-11], but nonetheless made plans to build a Rocky Top theme park [Doc. 1-13], saying, "[t]he magic of that name [Rocky Top], is going to bring [tourists] in" [Doc. 3-8].[14] They also said, "Success comes in a name — the name of Rocky Top" [*Id.*]. Even more, the developer defendants recognized that the theme-park project could proceed only if the city changed its name [Docs. 1-11, 1-17]. The Court thus finds it difficult, at this time, to conclude that the developer defendants have been acting in good faith in using the phrase "Rocky Top." *See Innovation Ventures, LLC v. N2G Distrib., Inc.*, — F.3d —, 2014 WL 3953734, at *8 (6th Cir. 2014) (finding evidence supported bad faith where "jury heard circumstantial evidence suggesting that Defendants knew of Plaintiff's protected mark and proceeded to copy it"); *Brimstone Recreation, LLC v. Trails End Campground, LLC*, No. 3:13-CV-331-PLR-HBG, 2014 WL 4722501, at *8 (E.D. Tenn. Sept. 22, 2014) (J., Reeves) (finding material question of fact regarding good faith where one could reasonably conclude that the defendant used the plaintiff's mark "not to identify the

---

[14] *See supra* footnote 11.

geographic location of their business, but to trade on the goodwill of the plaintiffs' marks").

Even more, the Court questions the developer defendants' asserted good faith because of the circumstances surrounding the filing of their intent-to-use applications. Within days of the City's name change, Tim Isbel, on behalf of Rocky Top Marketing and Manufacturing, began filing intent-to-use trademark applications that incorporated the phrase "Rocky Top" [*See* Docs. 54-3–53-10]. One of those applications incorporated lyrics of the song as well [*Compare* Doc. 53-4 (incorporating "Home Sweet Home" in the mark) *with* Doc. 43-1 (setting forth the lyrics to the song "Rocky Top")].

Finally, while even plaintiff conceded that there may be some permissible uses of "Rocky Top" as a geographic indicator, it does not appear that the developer defendants are using "Rocky Top" in a descriptive sense. Reviewing the marks set forth in the developer defendants' intent-to-use applications, it appears that some of the marks would not describe any geographic origin of goods or services. Indeed, evidence in the record at this point suggests that the company with which the developer defendants have entered into an exclusive licensing agreement for Rocky Top, Tennessee apparel and souvenirs, is not even located in the City and has plans to manufacture "Rocky Top, Tennessee" items outside of the City [Doc. 54-12; *see also* Doc. 66-2 (indicating plans for a "Rocky Top, TN Dry Goods and Denim" in Sevier County and elsewhere in Tennessee)].

Accordingly, for these reasons, the Court finds, based upon the record before it, that it is not likely that the developer defendants are fairly using "Rocky Top." And

taking this finding in connection with the Court's analysis of the justiciability of this dispute and the likelihood of success on the trademark infringement claim, the Court finds that plaintiff has demonstrated a strong likelihood of success on the merits.

### B.     Irreparable Injury

The Court is well aware that when there is a likelihood of confusion, irreparable injury "ordinarily follows." *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999) (citation omitted). Moreover, the Court appreciates plaintiff's argument that without a preliminary injunction, plaintiff will suffer in that "'its licensing program will lose much of the confidence reposed in it by (its) licensees' if they view [House of Bryant] as unwilling to protect the exclusivity of its licenses." *Frisch's Rests., Inc.*, 670 F.2d at 651 (quoting *Warner Bros. v. Gay Toys, Inc.*, 658 F.2d 76, 78 (2d Cir. 1981)). Thus, this factor weighs in plaintiff's favor.

### C.     Harm to Others

Plaintiff argues that the preliminary injunction will benefit plaintiff's licensees by protecting their interests and ability to market their goods bearing plaintiff's "ROCKY TOP" marks, but failing to issue a preliminary injunction will cause plaintiff's licensees to question the necessity of their licensing agreements with plaintiff and undermine contractual obligations. While the Court considers the latter point more of a reflection of the harm plaintiff would bear absent an injunction, it nonetheless understands that there is potential harm to third parties if the Court denies the requested injunction. In addition, the Court does not find that the developer defendants will be harmed by an injunction that

precludes them from using "Rocky Top" as a trademark because, as plaintiff conceded during the hearing, there are potential uses of "Rocky Top" that could be non-infringing.

## D. Public Interest

The Court acknowledges the "public interest in protecting trademarks." *See Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147, 151 (D.D.C. 2011) (concluding that the plaintiff was entitled to a permanent injunction because the public interest favored "protecting against further violation of federal copyright and trademark laws"); *Country Inns & Suites by Carlson, Inc. v. Two H.O. P'ship*, No. 01-cv-1214, 2001 WL 1587903, at *4 (D. Minn. Nov. 19, 2001) ("Federal trademark law is premised on the concept that protecting intellectual property and preventing consumer deception is in the public interest."). And given the Court's analysis regarding the likelihood of confusion, the Court finds that this factor thus weighs in plaintiff's favor.

In sum, the Court finds that the four preliminary injunction factors militate toward issuing an injunction against the developer defendants. *See Chanel, Inc. v. P'ships & Unincorporated Ass'n Identified in Schedule A*, No. 12-CV-2085, 2012 WL 3756287, at *2 (S.D. Tex. Aug. 28, 2012) (ordering a preliminary injunction in part because there was "good cause to believe" that more infringing items would appear in the marketplace and that "consumers may be misled, confused, and disappointed by the quality of these products; and that plaintiff may suffer loss of sales for its genuine products"); *Chanel, Inc. v. eukuk.com*, No. 2:11-CV-01508, 2011 WL 4829402, at *4 (D. Nev. Oct. 11, 2011)

(ordering a preliminary injunction in part due to the plaintiff's "well-founded fears" that additional infringing products would appear in the marketplace).

## III. Specific Injunction

Turning to the terms of the preliminary injunction, plaintiff provided the Court with a detailed request for relief [*See* Doc. 62]. Plaintiff further asked the Court to "draw a line" between fair use and infringement. The Court, though, finds it sufficient to enjoin the use of "Rocky Top" as a trademark on goods or services.

The next inquiry is to whom the injunction should apply. The Court finds that this injunction against using "Rocky Top" as a trademark on goods or services should apply to the developer defendants: Rocky Top Tennessee Marketing and Manufacturing Co., Tim Isbel, Brad Coriell, Mark Smith, and Michael Lovely. Yet, in its motion, plaintiff states it seeks to also enjoin "any other representative of [Rocky Top Tennessee Marketing and Manufacturing Co.]" [Doc. 53]. Rule 65(d)(2) addresses who may be bound by an injunction:

> **(2) *Persons Bound.*** The order binds only the following who receive actual notice of it by personal service or otherwise:
>
> **(A)** the parties;
>
> **(B)** the parties' officers, agents, servants, employees, and attorneys; and
>
> **(C)** other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

Fed. R. Civ. P. 65(d)(2). Because Rocky Top Tennessee Marketing and Manufacturing Co. is a defendant in this action, the Court may enjoin its "officers, agents, servants,

31

employees, and attorneys," under this rule and the Court finds that the injunction should apply to these individuals as well. The Court declines to enjoin any other individual or entity, however, because plaintiff has not demonstrated that anyone outside of the developer defendants—and their officers, agents, servants, employees, or attorneys—are "in active concert or participation" with the developer defendants.

## IV. Conclusion

Accordingly, the Court hereby **GRANTS** the developer defendants' Motion for Leave to File Supplemental Authority [Doc. 64] and **STATES** that it **WOULD GRANT** the motion for injunctive relief [Doc. 53], to the extent set forth herein, if the Court of Appeals for the Sixth Circuit remands for that purpose. Fed. R. Civ. P. 62.1.

IT IS SO ORDERED.


s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE